# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **WALDIMIR ADALBERTO CRUZ ROMERO,** <br><br> **Plaintiff** <br><br> **v.** <br><br> **ITW FOOD EQUIPMENT GROUP, LLC,** <br><br> **Defendant.** | **Civil Action No. 11-1799 (BJR)** <br><br> **ORDER AND MEMORANDUM OPINION ON CROSS-MOTIONS FOR PARTIAL SUMMARY JUDGMENT, DEFENDANT'S MOTION TO EXCLUDE EXPERT TESTIMONY, AND DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |

Plaintiff Waldimir Romero suffered severe injuries when his right hand became caught in the meat grinder he was operating in the course of his employment. He brought this strict product liability action against the manufacturer of the meat grinder, Defendant ITW Food Equipment Group, LLC, asserting design and warning defect claims. Now before the Court are (1) cross-motions for partial summary judgment on the defense of assumption of the risk, (2) Defendant's motion to exclude the testimony of Plaintiff's expert, Steven Kane, and (3) Defendant's motion for summary judgment on the merits. The motions are GRANTED in part and DENIED in part with the following result: Plaintiff's expert testimony is admissible only as to the warning defect claim and that claim alone may proceed to trial. The Court's reasons are set forth below.

## I. BACKGROUND

The Hobart Model 4046, pictured below, is a heavy-duty commercial meat grinder used by grocers and other high-volume meat processing businesses. Model 4046 Specifications Sheet, Dkt. No. 24-2, at 1. When the Model 4046 is used as designed, pieces of cut meat are placed on the feed pan and slid under the guard over the opening to the feed cylinder, wherein the meat

drops until it encounters the "worm," an oversize screw that turns at 215 revolutions per minute. *Id.* The meat is pushed by the worm towards a rotating knife, which shears off pieces of meat and forces them through a plate, producing ground meat. The Model 4046 can process up to 60 pounds of beef per minute. *Id.*



The Model 4046 is equipped with a safety system to prevent operation without the guard in place. The feed pan, to which the guard is permanently attached, sits atop an interlock plunger that must be depressed in order for the motor to run. Model 4046 Instruction Manual, Dkt. No. 24-5, at 5. If the feed pan is removed, then the plunger is released and the machine is inoperable; if the feed pan is in place, then the plunger is depressed, the machine operates normally, and the guard prevents the operator's hand from making contact with the worm. *Id.*

Defendant's business records indicate that after November 1962, one warning label was to affixed "above Push Buttons and one in same location on opposite side of Housing" on each Model 4046. Materials List, Dkt. No. 24-3, at 335. The text of the label is printed below:

```
┌─────────────────────────────────────┐
│               WARNING                │
│  DO NOT OPERATE THIS MACHINE         │
│  WITHOUT THE SAFETY DEVICES          │
│  PROVIDED BY HOBART:                 │
│  1. GUARD OVER CYLINDER OPEN-        │
│  ING.                                │
│  2. ELECTRICAL INTERLOCK UN-         │
│  DER FEED PAN.                       │
└─────────────────────────────────────┘
```

Affidavit of William Schlieper, Dkt. No. 24-3, ¶¶ 3–4. Although the Model 4046 here at issue left Defendant's control in 1967, Deposition of William Schlieper, Dkt. No. 23-6, at 80, the parties dispute whether it was in fact shipped with the warning label above, Plaintiff's Counter-Statement of Material Facts, Dkt. No. 27–3, at 3 ¶ 14. No warning label was on the machine at the time of the accident in 2009. *Id.*

Plaintiff, who is originally from El Salvador, began working for Moby Dick's House of Kabob in Washington, D.C. in late 2008 or early 2009. Deposition of Waldimir Romero ("Romero Depo"), Dkt. No. 23-5, at 8–9. Plaintiff used a Model 4046 to grind chicken and onions. *Id.* at 24–25. At his deposition, Plaintiff testified that he was not trained in the use of the Model 4046, was not given an instruction manual, and never saw any warnings on the machine or posted to the wall. *Id.* at 32–34. Instead, Plaintiff learned how to operate the Model 4046 by observing a co-worker. *Id.* at 33. Plaintiff observed the co-worker would remove the feed tray — to which the guard was attached — when grinding chicken because, Plaintiff surmised, the grease from the chicken made use of the feed tray difficult and time-consuming. *Id.* at 46–47, 53–55. Plaintiff therefore followed suit. *Id.* at 55. In order to defeat the interlock system, Plaintiff would set a bowl of chicken atop the plunger; he would then grab pieces of the chicken and throw them into the exposed feed cylinder. *Id.* at 56–58. Plaintiff testified that although he appreciated the danger of placing his hand inside the cylinder, *id.* at 58–59, he did not understand

the purpose of the guard: "I didn't know that it was specifically to protect anything. I thought it was to maybe put something on top." *Id.* at 51.

On August 13, 2009, Plaintiff was standing on a step and using the unguarded Model 4046 to grind chicken. *Id.* at 62. Plaintiff testified that at some point his right leg suddenly bent forward, his right foot slipped off the step, and he fell forward towards the machine. *Id.* at 63–64. His right arm, which was slippery from the fat and grease of the chicken, went into the feed cylinder and his hand was pulled into the worm. *Id.* at 64. Plaintiff suffered severe injuries to his right hand, which required amputation. *Id.* at 83–84.

In September 2011 Plaintiff brought this action in the Superior Court of the District of Columbia; soon thereafter Defendant removed the case to federal court. Notice of Removal, Dkt. No. 1. Plaintiff asserts strict product liability, negligence, and breach of warranty claims arising from alleged design and warning defects in the Model 4046. Complaint, Dkt. No. 1, at ¶¶ 14–40. Plaintiff claims the Model 4046 is defective in design because the guard is too easily removable, the interlock is too easily defeated, and the diameter of the feed cylinder is too large; Plaintiff also disputes whether the particular Model 4046 at issue was shipped with warning labels but argues that even if it were, the labels were inconspicuously located, insecurely attached, and lacking in size and content. Plaintiff's Opposition to Defendant's Motion for Summary Judgment ("Pl's Opp. to MSJ"), Dkt. No. 27–2, at 14, 29–30. Plaintiff relies principally upon an opinion prepared by his engineering expert, Steven Kane, in order to support his claims. *See* Opinion of Steven Kane ("Kane Op."), Dkt. No. 28–4.

In October 2012, following unsuccessful efforts at mediation, the parties filed the three motions now before the Court. First, the parties cross-move for partial summary judgment on the defense of assumption of the risk. *See* Plaintiff's Motion for Partial Summary Judgment

Regarding Affirmative Defense of Assumption of Risk, Dkt. No. 21; Defendant's Cross Motion

for Summary Judgment ("Def's Cross Mot."), Dkt. No. 24. Second, Defendant moves to exclude

the testimony of Steven Kane on the ground that it falls below the standard of reliability set forth

in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). *See* Defendant's Motion

*in Limine* to Exclude the Opinions and Testimony of Steven Kane ("Def's MTE"), Dkt. No. 25.

Third, Defendant moves for summary judgment on the merits, arguing that regardless whether

Kane's testimony is admitted, Plaintiff's design and warning defect claims fail as a matter of

law. *See* Defendant's Motion for Summary Judgment ("Def's MSJ"), Dkt. No. 22.

## II. DISCUSSION

Jurisdiction in this court is founded upon diversity of citizenship: Plaintiff appears to be

a domiciliary of Maryland, Defendant is a Delaware corporation with its principal place of

business in Illinois, and Plaintiff seeks damages of $5 million. Notice of Removal, Dkt. No. 1, at

¶¶ 5–7; *see* 28 U.S.C. §§ 1441(a), 1332(a). "As a result, the substantive tort law of the District

of Columbia governs this dispute." *Joy v. Bell Helicopter Textron, Inc.*, 999 F.2d 549, 553 (D.C.

Cir. 1993).

Although Plaintiff put forth several theories of product liability in his complaint — strict

liability, negligence, and breach of warranty — he presses only the strict liability claim in his

briefs here. This makes sense. In the District of Columbia, "the doctrines of implied warranty

and strict liability in tort are but two labels for the same legal right and remedy;" under either

theory, "there is a liability imposed for injury caused by placing a defective product into the

stream of commerce." *Payne v. Soft Sheen Products, Inc.*, 486 A.2d 712, 720 (D.C. 1985)

(internal quotation marks omitted). Plaintiff's warranty claim therefore merges into his strict

liability claim. In theory, negligence and strict liability are further apart: A negligence claim focuses upon the defendant's conduct, while a strict liability claim focuses upon the product itself. *Warner Fruehauf Trailer Co. v. Boston*, 654 A.2d 1272, 1277 n.13 (D.C. 1995). But where, as here, the allegedly negligent conduct *is* the sale of a defective product, negligence and strict liability are functionally the same. Both claims rise and fall with the alleged defect in the product itself. *Cf. McNeil Pharm. v. Hawkins*, 686 A.2d 567, 578 (D.C. 1996) ("[N]egligence and strict liability, in failure to warn cases, are functional equivalents"); *Payne*, 486 A.2d at 721–22 (same). At least for present purposes, then, Plaintiff's negligence claim also merges into his strict liability claim.

### A.      Assumption of the Risk

Defendant first argues Plaintiff assumed the risk of his injury by voluntarily bypassing the safety features of the Model 4046 despite knowing the danger of using the unguarded device. Specifically, Defendant claims Plaintiff "voluntarily removed the feed pan and guard assembly, intentionally defeated the interlock to run the meat chopper without a guard, and voluntarily stood on a slippery step with his right arm above the cylinder opening," all while aware of the open and obvious danger that he might be injured if his hand came into contact with the worm. Def's Cross Mot. at 7. "In the District of Columbia, assumption of risk by the injured party, if established, is a complete bar to recovery in a strict liability action." *Warner*, 654 A.2d at 1274. Because the analysis is "heavily fact-based," however, the Court will grant summary judgment only if "no real dispute exists as to the plaintiff's awareness of the relevant danger" and the moving party is entitled to judgment as a matter of law. *Maalouf v. Swiss Confederation*, 208 F. Supp. 2d 31, 42 (D.D.C. 2002).

Defendant stumbles at the outset by incorrectly describing assumption of the risk under District of Columbia law. Defendant relies upon a formulation of the defense applicable in a negligence action, *see* Def's Cross. Mot. at 6–9, but the District applies a more demanding test where strict product liability is concerned. "[I]n order to establish an assumption of risk defense in a strict liability action, the defendant must show that the plaintiff knew of the specific defect in the product and was aware of the danger arising from it, but nevertheless voluntarily and unreasonably proceeded to use the product." *Warner*, 654 A.2d at 1275. The keystone of the defense is the plaintiff's subjective knowledge: The plaintiff must have "actual knowledge of the specific defect in question and of the danger created by the defect." *Id.* Thus, in *Warner* itself, the D.C. Court of Appeals held the plaintiff had not assumed the risk of a 1,050-pound liftgate falling upon him even though it could be inferred that the plaintiff, a mechanic with 22 years of work experience and training in operating liftgates, "knew of the general danger associated with standing behind a liftgate." *Id.* The court explained there was no evidence that the plaintiff "had actual knowledge of the liftgate's alleged design defect — the lack of a back-up system (e.g., a second cylinder or other safety device) to prevent the heavy liftgate from free-falling in the event of a mechanical failure." *Id.*

In this case, the parties reasonably dispute whether Plaintiff had actual knowledge of the specific defects he has alleged — the guard is too easily removable, the interlock is too easily defeated, and the diameter of the feed cylinder is too large — and the dangers arising therefrom. *See* Plaintiff's Opposition to Defendant's Motion for Partial Summary Judgment on the Assumption of Risk Defense, Dkt. No. 26-2, at 7. Defendant argues Plaintiff must have known the guard was removable because he in fact removed the guard, Reply in Support of Defendant's Cross-Motion for Summary Judgment ("Def's Reply"), Dkt. No. 31, at 4, but a reasonable jury

could find Plaintiff was unaware of the danger because he testified he did not understand the purpose of the guard, Romero Depo. at 51. Similarly, Defendant argues Plaintiff must have known the interlock could be bypassed because he in fact bypassed the interlock, Def's Reply at 4, but the purpose of the interlock is to prevent use of the machine without the guard, and again, a reasonable jury could believe Plaintiff's testimony that he did not understand the purpose of the guard. Finally, Defendant argues Plaintiff must have known of the danger arising from the size of the feed cylinder because he testified he knew it would be "very dangerous" to reach into the cylinder, Romero Depo. at 61, but a reasonable jury could believe Plaintiff was unaware his hand would actually fit through the cylinder and reach the worm.

Defendant objects most forcefully to this last point, arguing the danger of the allegedly defective feed cylinder is open and obvious because the opening to the feed cylinder is so large that it "is obvious to anyone that a human hand can fit" inside. Def's Reply at 4. The danger of the allegedly oversize feed cylinder, however, is not that a human hand can fit inside the cylinder but that it may reach the worm. Although the top opening to the feed cylinder is fairly large at 8.125" on the longer axis and 6.8125" on the shorter axis, the feed cylinder is 8.375" deep and the bottom of the cylinder, closest to the worm, is just 4.78125" on the longer axis and 3.875" on the shorter axis. E-mail from Andrew Cox, Counsel for Defendant, to Dan Hessel, Counsel for Plaintiff (Apr. 24, 2012) ("Dimensions Email"), Dkt. No. 27-16. The worm, moreover, is encased and not directly visible to the operator. *See Liriano v. Hobart Corp.*, 170 F.3d 264, 269 (2d Cir. 1999). Under such circumstances, a reasonable jury could find it nonobvious that an operator's hand would pass through the cylinder and come into contact with the worm. Because the parties reasonably dispute whether Plaintiff knew of the various defects alleged and the dangers arising therefrom, the cross-motions for summary judgment as to assumption of the risk

are denied.

Defendant alternatively argues Plaintiff's "intentional misuse constitutes contributory negligence, which bars recovery on his negligence claim." Def's Cross Mot. at 9. As the Court has explained, however, Plaintiff's negligence claim merges into his strict liability claim, and "[c]ontributory negligence is not a defense to a strict liability claim." *E. Penn Mfg. Co. v. Pineda*, 578 A.2d 1113, 1118-19 (D.C. 1990); *see also Warner*, 654 A.2d at 1275 n.7. Accordingly, Defendant's motion for summary judgment as to contributory negligence is also denied.

### B. Expert Testimony

Defendant next argues the testimony of Plaintiff's engineering expert, Steven Kane, is unreliable and therefore inadmissible under the standards of Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Federal Rule of Evidence 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

In *Daubert*, the Supreme Court explained the trial judge's role under Rule 702 is to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." 509 U.S. at 589; *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999) (Court's gatekeeping function extends to engineering and other expert testimony). In order to be reliable, expert testimony "must be supported by appropriate validation — *i.e.*, 'good grounds,' based on what is known." *Daubert*, 509 U.S. at 590. It cannot be mere "subjective belief or unsupported

speculation." *Id.* In order to be relevant, expert testimony must assist "the trier of fact to understand the evidence or to determine a fact in issue." *Id.* (quoting Rule 702(a)). It must be "tied to the facts of the case" at hand. *Id.* at 591.

Kane's proffered testimony that the Model 4046 suffers from design and warning defects is of course highly relevant to Plaintiff's strict liability claim; indeed it is the evidentiary centerpiece of the case. Once the reliability of the testimony is challenged, however, the Court must conduct a preliminary but substantive inquiry into the methodology that underlies Kane's conclusions. *Id.* at 595. The Court must also make a threshold determination that, pursuant to Rule 702, Kane is qualified to testify as an expert. *See McReynolds v. Sodexho Marriott Servs., Inc.*, 349 F. Supp. 2d 30, 35 (D.D.C. 2004).

### 1.    Kane's Qualifications

Kane is a licensed engineer in New York and California and has worked with machine safety and warning systems for over 30 years. Resume of Steven Kane, Dkt. No. 28-10. He holds a B.S. in mathematics from the U.S. Coast Guard Academy, a M.S. in engineering mathematics from the University of Missouri — Rolla, and has been enrolled in the Ph.D. program in mechanical engineering at the State University of New York — Stony Brook. *Id.* Although Defendant objects that Kane has no specialized expertise in designing commercial kitchen equipment, Def's MTE at 5, Defendant does not explain why such specialized expertise is required in order to competently opine upon the safety of a basic mechanical device sold in 1967. In light of Kane's education and extensive professional experience in mechanical engineering, the Court holds Kane is qualified to testify as an expert in this case.

### 2.    Kane's Design Opinions

Kane opines the design of the Model 4046 is defective because the feed cylinder is too large, the guard is too easily removed, and the interlock is too easily bypassed.  Kane Op. at 17–21.  Defendant argues these opinions are speculative and therefore unreliable.  Def's MTE at 11–14.  The Court agrees.

Kane opines the Model 4046's feed cylinder is defectively designed because it is large enough in diameter to allow a human hand to pass through and reach the worm.  *Id.* at 17–19. Citing various patents, industry standards, and regulations, Kane posits Defendant should have used a "safety feed throat" with a diameter no greater than 2.5".[1]  Kane Op. at 19.  Such a design, Kane opines, would be "intrinsically safe" with no need for "guards ... or other things to prevent an operator's fingers from contacting the danger zone."  Deposition of Steven Kane ("Kane Depo."), Dkt. No. 23-4, at 118.

To better understand the nature of the alleged defect, it will be helpful to compare the Model 4046's feed cylinder to Kane's alternative design.  The Model 4046's feed cylinder is cylindrical, with an elliptical opening at the top, 8.125" on the major axis and 6.8125" on the minor axis, funneling into a smaller elliptical opening at the bottom, 4.78125" on the major axis and 3.875" on the minor axis; the depth is 8.375".  Dimensions Email.  The dimensions of Kane's design are less clear.  Kane does not provide drawings or a full set of specifications for his design, *see* Kane Depo. at 119, and the parties cannot agree upon what Kane has in mind.  It is clear enough that Kane would make at least one of the openings circular with a diameter of 2.5", but it is not clear whether Kane would modify the top opening, the bottom opening, or both. Plaintiff understands Kane to mean only the bottom opening should be made 2.5", so that the

---

[1] Kane also posits the depth of the feed cylinder should be at least 6–8".  Kane Depo. at 119–20.  Kane does not suggest the Model 4046's feed cylinder, which has a depth of 8.375", is defective on this ground.  *See* Dimensions Email.

feed cylinder retains its cylindrical shape.  Plaintiff's Surreply to Defendant's Reply Brief in

Connection with Defendant's Motion *in Limine*, Dkt. No. 34-4, at 1–2.  Defendant understands

Kane to mean both openings should be made 2.5", so that the feed cylinder takes on a tubular

shape.  Reply in Support of Defendant's Motion *in Limine* to Exclude the Opinions and

Testimony of Steven Kane, Dkt. No. 32, at 9.  The divergent interpretations are drawn below.



Regardless how Kane's design is interpreted, one thing is evident:  Kane would make the

bottom of the feed cylinder narrower.  As a result, Defendant argues, Kane's design would

reduce the Model 4046's feed capacity and thereby reduce its utility to its intended commercial

market.  Def's MTE at 7–8.  In order to claim a product is "defective" in the District of

Columbia, a plaintiff must identify "the risks, costs and benefits of the product in question and alternative designs, and [show] that the magnitude of the danger from the product outweighed the costs of avoiding the danger." *Warner Fruehauf Trailer Co., Inc. v. Boston*, 654 A.2d 1272, 1276 (D.C. 1995) (internal quotation marks omitted). Therefore, as Plaintiff concedes, Kane may testify that the Model 4046's feed cylinder is "defective" only if he can speak to the risk-utility tradeoff accompanying his alternative design — i.e., whether "the risk of injury resulting from the design of the Model 4046 outweighs the cost of avoiding the danger using the alternative design." Plaintiff's Opposition to Defendant's Motion *in Limine* to Preclude Plaintiff's Expert ("Pl's Opp. to MTE"), Dkt. No. 28-2, at 28.

Plaintiff's response is that Kane's alternative design would "meet[] all capacity expectations for a commercial meat chopper without detracting at all from the utility of the product." *Id.* at 30. In support of this rather remarkable claim, Plaintiff points to a 1985 engineering study that stated, in the context of a tubular "safety throat" with a diameter of 2.5" and a length of 4.5": "It was fortuitous that these dimensions were compatible with the capacity expectations of commercial meat grinders." Triodyne Inc. Safety Brief, Dkt. No. 28-12, at 2. Plaintiff's reliance upon the Triodyne study is misplaced. The study did not examine the performance of the 2.5" diameter safety throat and conclude it was suitable for all purposes; instead, it took the 2.5" diameter safety throat as its baseline and compared the performance of even narrower designs. *Id.* at 2. True, the study did state a 2.5" feed throat could accommodate "[a]lmost any practical feed capacity," *id.* at 4, but it did not analyze the matter, provide any citation, or otherwise support the apparently-offhand comment. In fact the substance of the study is to the contrary: It observes that even under ideal conditions, reducing the diameter of the safety throat from 2.5" to 2" diminishes first-cut capacity (i.e., the first grind of solid meat) by

36%. *Id.* at 3. The Triodyne study thus provides no support — and indeed undermines — Plaintiff's claim that Kane's alternative design would not reduce the utility of the Model 4046.

Kane, for his part, conducted no analysis of how his alternative design would affect the capacity of the Model 4046. Kane Depo. at 120–21. He did not compare the capacity of his design to that of the Model 4046, which is designed to process 60 pounds of beef per minute; indeed, he could not even say how much meat per minute his feed cylinder could process. *Id.* Although Plaintiff identifies several patents for narrower feed cylinder designs — including a few obtained by Defendant, *see* Pl's Opp. to MTE, at 23, 29 — Kane could not state with certainty whether any of the designs had made it into production, let alone production in a meat grinder with the same capacity as the Model 4046. Kane Depo. at 210–16. Nor was he aware of any actual meat grinder using his design with the same capacity as the Model 4046. *Id.* at 121–22. The point here is not that Kane was required to show his alternative design was commercially available — he was not — but that he cannot meaningfully speak to the risk-utility tradeoff accompanying his design, either by pointing to his own analysis, a third-party analysis, or a machine in actual use.

As a last ditch effort to support Kane's feed cylinder opinion, Plaintiff points to several industry standards and state regulations that, he claims, prohibited Defendant's design. *See* Pl's Opp. to MTE at 11–14. None are relevant. Plaintiff cites a Underwriters Laboratories ("UL") standard and a Pennsylvania regulation, but the Model 4046 was approved by the UL, Listing Card, Dkt. No. 24-3, and by the Pennsylvania Department of Labor and Industry, Certificate, Dkt. No. 25–13. Plaintiff cites regulations promulgated by the Occupational Safety and Health Administration (OSHA), but acknowledges they either apply to employers (not manufacturers) or were not in force in 1967, when the Model 4046 at issue was sold. Pl's Opp. to MTE at 12–

13.  Plaintiff cites a New York regulation that required a food grinder to be "provided with a hopper," i.e., feed cylinder, "of such size and arrangement that the operator's fingers cannot come in contact with the cutting or feeding knives or worms," but it is undisputed that the "arrangement" of the Model 4046's guard, if used, prevents the operator's fingers from coming into contact with the worm; Plaintiff's reading of the regulation to require both the cylinder be "arranged" to protect the operator *and* the cylinder's "size ... be designed to protect against such risks" is far-fetched.  *Id.* at 14; *accord. Beruashvili v. Hobart Corp.*, No. 05-CV-1646, slip op. at 16–17 (EDNY July 15, 2010).  In sum, Kane's opinion that the Model 4046's feed cylinder is defectively designed is speculative and unreliable; it therefore must be excluded.

Kane also opines the Model 4046's guard is defectively designed because it "may be removed without the use of tools."  Kane Op. at 20.  The Model 4046's guard, however, is permanently attached to the feed pan, and Kane admits the feed pan "must be removable with simple tools for compliance with sanitation standards."  *Id.*  If the design of the guard is defective, then, it is because the guard is attached to the feed pan — but Kane nowhere makes or supports such a claim.  As such, Kane's opinion that the guard is defective is also speculative and must be excluded.

Finally, Kane opines the Model 4046's interlock is defectively designed because it is "easily by-passed by simply depressing a plate."  *Id.*  Kane, however, did not suggest any alternative design in his report, making it impossible for the Court evaluate the basis for his opinion.  *See Artis v. Corona Corp. of Japan*, 703 A.2d 1214, 1217 (D.C. 1997) (in order for a product's design to be defective, there must be "a safer alternative design ... economically and technologically feasible at the time of the product's manufacture").  Although Kane mentioned a few alternative interlock designs at his deposition, Kane Depo. at 95–96, 101, 103, 109, he did

not include them, as required, in his written report, *see* FED. R. CIV. P. 26(a)(2)(B) (expert witness must include in his report "a complete statement of all opinions the witness will express and the basis and reasons for them"). In any event, Kane did not conduct any risk-utility analysis on the alternative designs. Kane Depo. at 102–03. In fact, he admitted that all interlocks can be bypassed; "[w]e're only talking about the degree of difficulty or the extent to which someone would have to go." *Id.* at 102. Because Kane has no basis for his opinion that the Model 4046's interlock was defectively designed, his testimony to that effect must be excluded.

### 3. Kane's Warning Opinions

Plaintiff disputes whether warning labels were ever attached to the Model 4046 here at issue. Pl's Opp. to MTE at 33. Assuming the warning labels identified by Defendant were in fact attached at the time of sale, Kane opines they were defective because they were (1) too small, (2) affixed using an adhesive rather than engraved upon metal plates and attached using screws, (3) inconspicuously located "so as not to be visible from a normal operating position," and (4) lacking in information concerning the nature of hazard (i.e., crushing and cutting) and in the consequences of disregarding the warning (i.e., amputation). Kane Op. at 23. Defendant again argues Kane's opinions are speculative and therefore unreliable. The Court disagrees.

Defendant first argues Kane's opinion as to the content of the warning label is unreliable because he has not developed or tested an alternative label. Def's MTE at 14–15. The District of Columbia, however, does not require a plaintiff claiming a defective warning to provide an alternative label. Instead, the District treats a strict liability warning defect claim as essentially a claim of negligence: "[T]he plaintiff must establish the applicable standard of care, show that the defendant violated that standard, and that the violation was the proximate cause of the

injury." *McNeil Pharm. v. Hawkins*, 686 A.2d 567, 578 (D.C. 1996). An expert may therefore testify that a warning label is "defective" if he has grounds to believe it did not meet the standard of ordinary care. *See E. Penn Mfg. Co. v. Pineda*, 578 A.2d 1113, 1118 (D.C. 1990) ("The duty of the manufacturer ... [is] essentially one of ordinary care"). Although Kane did not research industry standards in force in 1967, Kane Depo. at 139, his own qualifications and experience provide a sufficient foundation for his implicit opinion that the content of the label did not meet the standard of ordinary care, i.e., what was reasonable in light of "the potential magnitude of the harm, and the likelihood of its occurrence," *Pineda*, 578 A.2d at 1122, as reasonably foreseeable by Defendant at the time the Model 4046 left its control. Kane's opinion with respect to the content of the warning label is therefore admissible.

Defendant next argues Kane's opinion with respect to the durability of the label is irrelevant because "District of Columbia law ... analyzes the safety of the product in the condition it was in when it left the manufacturer's control." Def's MTE at 15. This is a strange argument because the alleged durability defect did exist at the time of sale. That the failure to secure the label did not cause harm until much later is beside the point; in this respect, it is like a latent manufacturing defect.[2] Although the D.C. Court of Appeals has not yet considered a warning defect claim based upon the durability of the label, it has distinguished between "(1) failure to take adequate steps to ensure the warning was communicated to the ultimate user — issues involving the prominence and location of the label — and (2) failure to provide a warning that, if communicated to the user, would have been adequate to warn of risks — which involves the content of the warning." *Pineda*, 578 A.2d at 1124. Like a "prominence" or "location" challenge, Kane's durability opinion goes to a "failure to take adequate steps to ensure the

---

[2] Defendant's citations to *Ferguson v. F.R. Winkler GMBH & Co. KG*, 79 F.3d 1221, 1226 (D.C. Cir. 1996), and *Kline v. ABCO Eng'g Corp.*, 991 F. Supp. 747, 751 n. 5 (D. Md. 1997), are inapposite. *See* Def's MSJ at 16. In both cases, the warning labels had been painted over, an alteration obviously not attributable to the manufacturer.

warning was communicated to the ultimate user." *Id.* As such, it is relevant to this case.

Defendant finally argues Kane's durability opinion is speculative because he has "done no test or evaluation on the durability of warning labels on commercial kitchen equipment." Def's MTE at 15. As the Court has already noted, however, an expert may testify that a warning is defective so long as he has grounds to believe it did not meet the standard of ordinary care. Given his professional qualifications and experience, Kane can reliably testify, without further analysis, that the label was inadequately secured given the reasonably foreseeable risks in 1967. Kane's durability opinion is therefore admissible.

### C.      Summary Judgment

A party may move for summary judgment on the ground "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). In order to defeat the motion, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); the party must "produce affirmative evidence supporting the challenged aspects of his claims by affidavit or other competent evidence." *Mulhern v. Gates*, 525 F. Supp. 2d 174, 186 (D.D.C. 2007). "The evidence is to be viewed in the light most favorable to the nonmoving party and the court must draw all reasonable inferences in favor of the nonmoving party." *Talavera v. Shah*, 638 F.3d 303, 308 (D.C. Cir. 2011). "[I]f the evidence is such that a reasonable jury could return a verdict for the nonmoving party," then summary judgment must be denied. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Defendant has moved for summary judgment on Plaintiff's design and warning defect claims. *See* Def's MSJ.

### 1. Design Defect Claims

In order to establish strict liability in the District of Columbia based upon a design defect, a plaintiff must identify "the risks, costs and benefits of the product in question and alternative designs, and [show] that the magnitude of the danger from the product outweighed the costs of avoiding the danger." *Warner Fruehauf Trailer Co., Inc. v. Boston*, 654 A.2d 1272, 1276 (D.C. 1995). Plaintiff concedes he "relies primarily on the expert engineering opinions of Steven Kane," Pl's Opp. to MSJ at 20, but the Court has ruled Kane's design defect opinions inadmissible. Because without Kane's testimony, Plaintiff will be unable to meet his burden of producing affirmative evidence to show a genuine dispute as to the existence of a design defect, Defendant is entitled to summary judgment on the design defect claims.

### 2. Warning Defect Claims

In order to make out strict liability in the District of Columbia based upon a warning defect, a plaintiff "must establish the applicable standard of care, show that the defendant violated that standard, and that the violation was the proximate cause of the injury." *McNeil Pharm. v. Hawkins*, 686 A.2d 567, 578 (D.C. 1996). "Generally, the existence of a risk of harm reasonably foreseeable to the product supplier gives rise to a duty to warn of the danger, and to advise of means of ameliorating it." *E. Penn Mfg. Co. v. Pineda*, 578 A.2d 1113, 1119 (D.C. 1990). Plaintiff's expert, whose testimony on this subject is admissible, opines Defendant's warnings were defective because they were inconspicuously located, insecurely attached, and lacking in size and content. *See* Kane Op. at 23.

The Court has already addressed the substance of two of Defendant's objections. First, Defendant argues it "had no duty to warn because the risk of operating an unguarded meat

chopper was open and obvious." Def's MSJ at 15. But as the Court has already explained, a reasonable jury could find it nonobvious that an operator's hand would pass through the feed cylinder and come into contact with the encased worm. Second, Defendant argues Plaintiff cannot complain about the deterioration of the warning label because in the District of Columbia, "[t]he adequacy of a warning is evaluated at the time the product left the manufacturer's control." *Id.* at 16. But as the Court has already explained, Plaintiff claims the warning labels were insecurely attached *at the time of sale*, and the District recognizes a warning defect claim based upon a "failure to take adequate steps to ensure the warning was communicated to the ultimate user." *Pineda*, 578 A.2d at 1124.

Defendant next argues any warning defects cannot be the factual cause of Plaintiff's injury because he lacked the English proficiency to read a warning. Def's MSJ at 18. Although Plaintiff is entitled to a "rebuttable presumption ... that [he] would have read an adequate warning," *Payne v. Soft Sheen Products, Inc.*, 486 A.2d 712, 725 (D.C. 1985), Defendant points to Plaintiff's inability at his deposition to read any part of the Model 4046's warning label aside from the word "Warning," Romero Depo. at 37–38. Plaintiff also testified, however, that "I understand quite a bit more [English] than I speak," *id.* at 6; whether Plaintiff would have understood an adequate warning is, on this record, plainly a question for the jury. In any event, Plaintiff correctly notes that factual causation does not necessarily depend upon his own English skills. He can argue to the jury that had Defendant "provided an adequate warning ..., then Romero's co-workers and supervisors would have known of th[e] hazard, and they would have been able to communicate the warning to Romero." Pl's Opp. to MSJ at 38. Indeed, the D.C. Court of Appeals has explicitly approved a causation theory based upon the possibility of a co-worker or employer conveying a warning. *Pineda*, 578 A.2d at 1124–25 (discussing *Ferebee v.*

*Chevron Chemical Co.*, 552 F.Supp. 1293 (D.D.C. 1982), *aff'd*, 736 F.2d 1529 (D.C. Cir. 1984)).

Finally, Defendant argues all Plaintiff's claims are barred because his misuse of the Model 4046 was the proximate cause of his injuries. Def's MSJ at 19. "Product 'misuse' is defined as use of a product in a manner that could not reasonably be foreseen by the defendant." *Payne*, 486 A.2d at 725. Defendant claims Plaintiff has presented no evidence showing it was reasonably foreseeable that a user would remove the guard and bypass the interlock, but Plaintiff points out that Defendant's warning label, *see infra* at 3, cautions against precisely those acts. Pl's Opp. to MSJ at 40. "Whether the injury ... arose out of proper use of the product, out of use that could reasonably have been foreseen by defendant, or out of product misuse, is a jury question and should not [be] decided as a matter of law by the trial court." *Payne*, 486 A.2d at 726. On this record, the Court concurs.

## III.     CONCLUSION

For the foregoing reasons, it is, hereby this 30th day of October, 2013:

1.     ORDERED that Plaintiff's motion for partial summary judgment on the defense of assumption of the risk is DENIED. Defendant's motion for partial summary judgment on assumption of the risk and contributory negligence is also DENIED. It is further,

2.     ORDERED that Defendant's motion to exclude the testimony of Steven Kane is GRANTED as to Kane's design defect opinions and DENIED as to Kane's warning defect opinions. It is further,

3.      ORDERED that Defendant's motion for summary judgment is GRANTED as to

Plaintiff's design defect claims and DENIED as to Plaintiff's warning defect claims.


SO ORDERED.

_____
BARBARA J. ROTHSTEIN
UNITED STATES DISTRICT JUDGE